# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:15-cr-126 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| DENNIS M. HICKS, | : | |
| | : | |
| Defendant. | : | |

## ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS (Doc. 15)

This criminal case is before the Court on Defendant's motion to suppress (Doc. 15) and the Government's response in opposition (Doc. 16). The Court held an evidentiary hearing on April 21, 2016. (Min. Entry, Apr. 21, 2016).[1]

## I. BACKGROUND

On December 16, 2015, Defendant Dennis Hicks was charged in a one-count indictment with felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. 1). The charge arises from evidence obtained by officers of the Harrison, Ohio Police Department (the "HPD") during a traffic stop and subsequent search of Defendant's vehicle. (Docs. 15, 16). On February 15, 2016, Defendant filed the instant motion. (Doc. 15). For purposes of this motion, the Court will rely upon the facts as set forth in the parties' briefs (Docs. 15, 16), as well as the testimony and evidence proffered at the April 21, 2016 suppression hearing:

---

[1] A transcript of the evidentiary hearing was prepared at the Court's request and was docketed on April 26, 2016. (Doc. 17). Given the importance of the transcript for purposes of preparing this Order, the Court considers the motion to have come ripe for decision on April 27, 2016 (*i.e.*, after receipt of the transcript).

On September 13, 2015, at approximately 12:41 a.m., HPD Officer Christopher MacMurdo ("Officer MacMurdo") initiated a traffic stop after observing a vehicle drive left of center over a double yellow line on multiple occasions (*i.e.*, swerving). (Doc. 16 at 1; Tr. 7:2-7; Ex. 1).[2] The driver complied by pulling into the parking lot of a local business, followed by Officer MacMurdo, who stopped approximately six to ten feet behind him. (Tr. 15:1-18). Before exiting his police cruiser, Officer MacMurdo ran a registration check on the vehicle and "called out the stop" (meaning, he communicated the details of the traffic stop to dispatch). (*Id.* at 7:15-19). Officer MacMurdo testified that it was at this time when he observed the driver of the vehicle appear to lean back in the seat, then make movements toward his waistband, and then immediately reach for the glove box.[3] (*Id.* at 7:15-23, 17:16-20:4).

The registration check identified the vehicle owner to be Defendant Dennis Hicks. (Tr. 16:16-24). Officer MacMurdo testified that he recognized Defendant's name, though he was unsure whether Defendant was driving the vehicle at that time. (*Id.*) According to Officer MacMurdo, based on his knowledge and prior contact, he was aware that Defendant had previously been found in possession of prescription and 'street' drugs and a firearm. (*Id.* at 6:16-17, 9:9-16). Officer MacMurdo also suspected that the driver of the vehicle may be intoxicated and therefore would need to submit to a field sobriety test,

---

[2] Defendant's Exhibit 1 is a copy of the police report relating to the traffic stop and subsequent arrest, which includes a one-page "Arrest and Investigation Report" and a thirteen-page "Incident/Offense Report." (Ex. 1).

[3] Officer MacMurdo explained that because his police vehicle is a large SUV and his headlights were on, he was able to see into the interior of the stopped vehicle. (Tr. 7:19-8:6).

which test Officer MacMurdo had not administered recently, as he had just returned from an assignment with the drug task force.[4] (*Id.* at 20:7-18). Accordingly, Officer MacMurdo called for HPD Officer Michael Rhoads ("Officer Rhoads") as backup. (*Id.* at 8:13).

While waiting for Officer Rhoads, Officer MacMurdo approached the stopped vehicle and made contact with the driver—whom he then recognized as Defendant—to ask for his driver's license, vehicle registration, and proof of insurance. (Tr. 8:13-16, 20:23-21:1). Defendant provided his driver's license, but informed Officer MacMurdo that he did not have the other requested documentation. (*Id.* at 8:17-20). Officer MacMurdo asked Defendant if he wished to check the glove box, but Defendant declined, stating that the documents were not there. (*Id.*) Officer MacMurdo then returned to his police cruiser to check Defendant's driving status and wait for Officer Rhoads. (*Id.* at 8:21-22).

Within a few minutes, Officer Rhoads arrived at the scene, at which point both officers approached the stopped vehicle. (Tr. 8:23-9:4-8). Officer MacMurdo asked Defendant to step out of the car and took him toward the rear of the vehicle where Officer Rhoads was waiting to administer the field sobriety test. (*Id.* at 9:6-8, 22:11-20). While Officer Rhoads administered the test, Officer MacMurdo went to the passenger-side window and made contact with the female passenger of the vehicle. (*Id.* at 9:21-24,

---

[4] Officer MacMurdo testified that he was initially assigned to the Drug Abuse Reduction Task Force as an undercover drug agent for six months in 2009, and then was later sent back to the drug unit from 2011 to 2014. (Tr. 36:12-24). Officer MacMurdo also testified that he received specialized drug training during his three and a half years with the drug unit. (*Id.* at 36:23-37-3).

22:19-23).  Officer MacMurdo stated that his earlier check of Defendant's driving status revealed that Defendant was subject to a protection order, prohibiting his contact with a named female whom Officer MacMurdo was concerned might be the female passenger in the vehicle.  (*Id.* at 9:17-24, 23:15-24).  After making contact and identifying the passenger, Officer MacMurdo was able to confirm that the passenger was not the same female named in the protection order.[5]  (*Id.* at 9:25-10:1, 23:25-24:5).

However, according to Officer MacMurdo, it was at this time—specifically, as he was approaching the passenger's side of the vehicle—that he observed in plain view an open box of sandwich bags on the floorboard behind the passenger's seat.  (Tr. 10:1-3).  Further, Officer MacMurdo testified that while speaking with the passenger he also saw a digital scale placed on top of the elevated section of the floorboard between the driver's and passenger's seats.  (*Id.* at 10:3-6, 24:8-12).  Finally, he observed an open container of beer near the passenger's feet.  (*Id.* at 10:6-7).  Officer MacMurdo specified that, based on his training and experience, the sandwich bags and scale are indicative of narcotics trafficking.  (*Id.* at 10:8-24).  At Officer MacMurdo's request, the passenger handed him the digital scale, at which time he noticed that it was covered in a white residue.  (*Id.* at 11:2-5).  Officer MacMurdo then had the passenger step out of the vehicle as well.  (*Id.*)

---

[5] Pursuant to Ohio Rev. Code 2935.03(B)(3)(b):

> If … a peace officer has reasonable grounds to believe that … the offense of violating a protection order has been committed and reasonable cause to believe that a particular person is guilty of committing the offense, it is the preferred course of action in this state that the officer arrest and detain that person … until a warrant can be obtained.

4

Officer MacMurdo then approached Defendant who was still at the rear of the vehicle with Officer Rhoads.[6]  (Tr. 11:6-17).  He advised Defendant of what he had found and asked whether there was any other contraband in the vehicle, which Defendant denied.[7]  (*Id.* at 11:6-9).  Officer MacMurdo informed Defendant that, based on what he had seen, he was going to conduct a search of the vehicle.  (*Id.* at 11:9-10).  He then proceeded to search the vehicle, starting first with the glove box.  (*Id.* at 11:11-12).  Upon opening the glove box, Officer MacMurdo found a loaded Kel-Tec 9mm handgun, a second loaded magazine, and a box of ammunition.  (*Id.* at 11:12-14).  Officer MacMurdo showed Officer Rhoads the items he had found and Defendant was placed under arrest and secured in Officer MacMurdo's cruiser.  (*Id.* at 11:18-12:11).  No other items were found during the search of the vehicle or on Defendant's person.  (*Id.* at 11:12-19).

As Defendant was being arrested and taken to the cruiser, Officer MacMurdo observed Officer Rhoads administer Defendant's *Miranda* warning and ask about the firearm, to which Defendant responded, "Just take me to jail."  (*Id.* at 11:20-12:1, 33:7-20).  Later, after Defendant was taken to the HPD and while he was being processed, Officer MacMurdo made one final inquiry regarding the firearm, in response to which

---

[6] By that time, Defendant had completed the nystagmus test (also referred to as the "horizontal gaze" test), which had not revealed any signs of intoxication.  (Tr. 22:24-23:9).

[7] Officer MacMurdo testified that the main purpose of his inquiry was to determine whether there was anything in the vehicle that could pose a threat to officer safety, or the safety of the public.  (Tr. 31:22-33:1, 38:3-14).  Most significantly, Officer MacMurdo stated that he was worried about inadvertently 'sticking' himself with a stray needle, which he explained was of particular concern given his knowledge of Defendant's past heroin use.  (*Id.*)

Defendant indicated that he had 'found the gun.' (*Id.* at 33:21-34:23). In total, the incident, beginning with the initial stop until Defendant's arrival at the station, lasted approximately one to two hours. (*Id.* at 38:18-39:23).

## II. STANDARD OF REVIEW

The Fourth Amendment ensures that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

A defendant may seek the suppression of evidence by filing a pretrial motion with the court. Fed. R. Crim. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Patel*, 579 F.App'x 449, 453 (6th Cir. 2014) (citing *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir.2003)). However, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). Therefore, "[t]he Government has the burden of proof to justify a warrantless search." *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002); *Coolidge v. New Hampshire*,

403 U.S. 443, 455 (1971) ("The burden is on those seeking the exemption to show the need for it.") (quotation marks and citations omitted).

### III. ANALYSIS

Defendant moves to suppress "any and all evidence seized, including statements, based on violations of [Defendant's] rights under the Fourth and Fifth Amendments to the United States Constitution." (Doc. 15 at 5).

#### A. Evidence Seized During the Search

First, Defendant argues that any and all evidence must be suppressed as having been obtained during a warrantless search resulting from his unlawful stop, detention, and arrest, none of which was subject to a recognized exception to the warrant requirement. (Doc. 15). The Court disagrees.

#### 1. The Initial Stop Was Not Unlawful

Defendant first contends that "the officers did not have reasonable suspicion at the inception to stop his vehicle." (Doc. 15 at 3).[8]

"It is well established that a police officer lawfully may stop a car when he has probable cause to believe that a civil traffic violation has occurred, or reasonable suspicion of an ongoing crime." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012); *Whren v. United States*, 517 U.S. 806, 810 (1996) ("[T]he decision to stop an

---

[8] This argument presupposes that the initial stop was solely a *Terry* investigative stop for a criminal violation, and fails to distinguish the probable cause standard applicable to civil traffic violations. *See United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) ("[There are] two separate tests to determine the constitutional validity of vehicle stops: [1] an officer must have probable cause to make a stop for a civil infraction, and [2] reasonable suspicion of an ongoing crime to make a stop for a criminal violation") (emphasis added).

automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). "Probable cause is a reasonable ground for belief supported by less than *prima facie* proof but more than mere suspicion." *Blair*, 524 F.3d at 748. A police officer's observation of a traffic violation provides sufficient probable cause to authorize a traffic stop. *See*, *e.g.*, *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010); *United States v. Burton*, 334 F.3d 514, 517 (6th Cir. 2003).

Where probable cause exists to justify the traffic stop, a police officer's subjective intent is irrelevant. *Whren*, 517 U.S. at 813. Moreover, probable cause is not diminished even if a reasonable officer would not typically initiate a stop for the violation, nor is probable cause extinguished if it is later discovered that no violation actually occurred. *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993). The relevant inquiry in determining whether probable cause existed to initiate a traffic stop "is fact-dependent and will turn on what the officer knew at the time he made the stop." *Id*. "So long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *Id*.

Here, Officer MacMurdo testified that he initiated the traffic stop at approximately 12:41 a.m. after he personally "observed several marked lane violations where [the vehicle] crossed over the double yellow approximately four times, and also touched the white line on the right side of the road … two or three times." (Tr. 7:4-7). Officer MacMurdo's observation of a vehicle repeatedly driving left of center provided sufficient probable cause to initiate a traffic stop for the marked lane violations (*i.e.*, a

civil traffic violation). *See Street*, 614 F.3d at 232 ("When law enforcement officers witness a traffic violation, they may stop the driver and his car [without obtaining a warrant]. … [T]here is nothing 'unreasonable' about stopping a vehicle whose driver has just committed a traffic violation.").

Therefore, the Court finds that the initial stop was lawful.

### 2. *The Scope and Duration of Detention Were Not Unlawful*

Next, Defendant argues that "the seizure was not reasonably related in scope to the circumstances," and that "the officers extended the stop beyond the time necessary to effectuate the purposes of the stop." (Doc. 15 at 3-4).

As the Supreme Court has explained:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

*Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citations omitted). However, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

In determining whether a stop was prolonged unreasonably, "the overarching consideration is the officers' diligence … [in] ascertaining whether the suspected traffic violation occurred, and, if necessary, issuing a ticket." *United States v. Everett*, 601 F.3d

9

484, 493 (6th Cir. 2010). That is not to say, however, that an officer's sole focus must be upon the traffic violation. *Id.* ("[T]he reasonable diligence standard does not require an officer to move at top speed….") (internal alterations and citations omitted). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop … [but] he may not do so in a way that prolongs the stop, <u>absent the reasonable suspicion ordinarily demanded to justify detaining an individual</u>." *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015) (emphasis added).

Accordingly, "[o]nce the purpose of the initial traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened <u>during the stop</u> to cause the officer to have a 'reasonable and articulable suspicion that criminal activity [is] afoot.'" *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) (quoting *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999)) (emphasis in original). Reasonable suspicion is assessed based on the totality of the circumstances and "requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "[W]ithout such reasonable suspicion, all the officer's actions must be 'reasonably related in scope to circumstances justifying the original interference.'" *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (quoting *Hill*, 195 F.3d at 264).

Here, Officer MacMurdo testified that the marked lane violations he observed raised the additional concern that the driver of the vehicle may be intoxicated. (Tr. 14:5-

10

19).  Specifically, he stated that it is unusual for drivers to swerve in the manner he had just observed, thereby leading him to believe that the driver may be under the influence and that further inquiry was warranted.  (*Id.*)  Accordingly, upon initiating the stop, Officer MacMurdo immediately called for a fellow officer, Officer Rhoads, to arrive at the scene in order to conduct a field sobriety test.  (*Id.* at 8:13).  Upon Officer Rhoads' arrival at the scene, Defendant was promptly asked to step out of the vehicle and the field sobriety test commenced.  (*Id.* at 9:4-8, 22:11-20).  Notably, while a field sobriety test can involve multiple different tests, the Officers here did not attempt to unreasonably prolong the detention by needlessly administering each.  Rather, Officer Rhoads only administered one test (*i.e.*, the nystagmus test).  (*Id.* at 22:24-23:9).

Moreover, although it took no more than a few minutes for Officer Rhoads to arrive as backup, Officer MacMurdo continued to conduct the traffic stop in the interim by approaching the vehicle, making contact with the driver, running a check on his driving status, *etc.*  (Tr. 8:13-16, 20:23-21:1).  Therefore, it cannot be said that Officer MacMurdo did not diligently pursue the ultimate end goal of the traffic stop.

Further, in conducting the traffic stop while awaiting Officer Rhoads, Officer MacMurdo came to find additional information, which provided the basis for further inquiry.  Specifically, in checking Defendant's driving status, Officer MacMurdo learned that Defendant was subject to a protection order, which raised concern that the protected female might be the female passenger of the vehicle.  (Tr. 9:17-24, 23:15-24).  Critically, Officer MacMurdo approached the female passenger to dispel this concern while Officer Rhoads was administering Defendant's field sobriety test.  (*Id.* at 9:17-24, 22:19-23,

11

23:15-24). Therefore, even if the presence of an unidentified female in the vehicle did not provide reasonable suspicion to expand the scope of the traffic stop, Officer MacMurdo's unrelated inquiry was entirely permissible, as it did not prolong the duration of the stop. *See Johnson*, 555 U.S. at 333.

For purposes of determining the permissible scope and duration of the seizure, the critical point in time was when the traffic stop officially became an investigative stop. *See United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th 2008). Here, that shift occurred when Officer MacMurdo observed in plain view the sandwich bags, the digital scale, and the open container of beer. (Tr. 10:1-7). Officer MacMurdo testified that, based on his training—including three and a half years with the drug unit, at least six months of which were spent as an undercover agent—the items he observed in plain view were indicative of narcotics trafficking. (*Id.* at 10:8-24). This belief was compounded by Officer MacMurdo's familiarity with Defendant, including his history of drug abuse. (*Id.* at 32:21-33:1).

The Court finds that, given the totality of the circumstances, including the observations of Officer MacMurdo, particularly in light of his extensive and training, and his prior knowledge and interactions with Defendant, Officer MacMurdo had a reasonable, articulable suspicion that Defendant was engaged in criminal activity. Accordingly, the expansion in duration and scope of the traffic stop was permissible and did not infringe upon Defendant's Fourth Amendment rights.

### 3. *The Automobile Exception & Plain View Doctrine Apply*

Defendant argues that because the plain view doctrine does not justify the warrantless search conducted in this case, the resulting evidence must be suppressed. Again, the Court disagrees.

While the Fourth Amendment typically requires law enforcement to obtain a warrant before conducting a search, the Supreme Court has recognized an exception to this rule applicable to the search of vehicles—the automobile exception. *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999)). "The automobile exception applies even in nonexigent circumstances and even when the officer's decision to stop the vehicle was pretextual." *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012) (citations omitted). "Under the automobile exception to the warrant requirement, an officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity." *Id*. "Probable cause is a reasonable ground for belief supported by less than *prima facie* proof but more than mere suspicion." *Blair*, 524 F.3d at 748. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *California v. Acevedo*, 500 U.S. 565, 570 (1991) (internal quotation marks and citations omitted).

Once an officer has probable cause to search a vehicle under the automobile exception, evidence found may be seized pursuant to the plain view doctrine. *Texas v. Brown*, 460 U.S. 730, 738 (1983). The plain view doctrine applies if: (1) the item to be

13

seized is in plain view; (2) the officer is legally present in the location from which the item can be plainly seen; (3) the incriminating nature of the item is immediately apparent; and (4) the officer has the right to access the object. *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). In other words, "'plain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment." *Id.* However, "[i]t is important to distinguish 'plain view,' as used … to justify seizure of an object, from an officer's mere observation of an item left in plain view … [as] the latter generally involves no Fourth Amendment search, [while] the former generally does implicate the Amendment's limitations upon seizures of personal property." *Id.* at 738, n.4 (citations omitted) (emphasis added).

Here, Officer MacMurdo testified that he first saw sandwich bags, a digital scale, and an open container of beer in plain view. (Tr. 10:1-7). Significantly, Officer MacMurdo testified that, based on his extensive, particularized experience, the presence of sandwich bags and a digital scale together—not in a location such as a kitchen, but in the backseat of a vehicle—is indicative of narcotics trafficking. (*Id.* at 10:8-24). Notably, at this stage, the items at issue were merely "left in plain view," and not in 'plain view' "to justify seizure." *See Brown*, 460 U.S. 738, n.4. Accordingly, the Fourth Amendment was not yet implicated.

Coupled with his observations of the items which, based on his training and experience, indicated narcotics trafficking, Officer MacMurdo was also very familiar with Defendant's prior criminal history and knew that Defendant was previously found in

14

possession of drugs and a firearm.[9]  In short, the totality of the circumstances provided sufficient probable cause to search Defendant's vehicle without a warrant under the automobile exception.

Once the search was justified under the automobile exception, Officer MacMurdo was authorized to search the entirety of the vehicle, including the glove box.  *See Acevedo*, 500 U.S. at 570.  Further, upon opening the glove box and seeing the firearm, the plain view doctrine justified its seizure.  Specifically, Officer MacMurdo: (1) could see the firearm in plain view; (2) was legally present in the location from which he plainly saw the firearm; (3) the incriminating nature of a firearm in the glove box was immediately apparent; and (4) the automobile exception gave him a right to access the firearm.  *See Garcia*, 496 F.3d at 508.

As the search of the vehicle and seizure of the firearm were authorized under the automobile exception and plain view doctrine, suppression of the evidence is not warranted.

### B.  Defendant's Statements to the Officers

Finally, Defendant moves to suppress three particular statements made during and as a result of the stop, search, and arrest, arguing that said statements are "fruit of the poisonous tree," and were obtained in contravention of the Fifth Amendment and *Miranda*.  (Doc. 15 at 5).  Specifically, Defendant moves to suppress: (1) his pre-

---

[9] *See also, United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004) ("[O]fficers who stop a person who is 'reasonably suspected of carrying drugs' are 'entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions,' and to take reasonable measures to protect themselves.") (quoting *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001)).

*Miranda* statement denying that any contraband would be found in his vehicle, given in response to Officer MacMurdo's question prior to the search; (2) his post-*Miranda* statement of "Just take me to jail," in response to Officer Rhoads administering the *Miranda* warning during Defendant's arrest; and (3) his post-*Miranda* statement that he found the firearm, given in response to Officer MacMurdo's inquiry during processing.

      The Fifth Amendment to the United States Constitution provides that, "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the U.S. Supreme Court established procedural safeguards to ensure that this Fifth Amendment privilege was protected during "in-custody interrogation of persons suspected or accused of crime." 384 U.S. 436, 467 (1966). The *Miranda* safeguards address the concern that 'custodial interrogation' produces "inherently compelling pressures which work to undermine the individual's will to resist and [] compel him to speak where he would not otherwise do so freely." *Id.* Accordingly, under *Miranda*, "the prosecution may not use statements … stemming from custodial interrogation of the defendant unless … [p]rior to any questioning, [he is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444. "[A]fter giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010).

      "Invocation … 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney' [or the right to

16

remain silent]." *Davis v. United States*, 512 U.S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)).  However, "if a suspect makes a reference … that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect <u>might</u> be invoking … [*Miranda*] does not require the cessation of questioning." *Davis*, 512 U.S. at 459 (emphasis in original).  In other words, invocation of the right to counsel or to remain silent must be made unequivocally and unambiguously. *Thompkins*, 560 U.S. at 381-382.  Once a suspect unequivocally and unambiguously invokes his *Miranda* rights, interrogation must cease and "the exercise of those rights must be fully honored." *Miranda*, 384 U.S. at 467; *Thompkins*, 560 U.S. at 388.

Alternatively, an individual may waive his rights after receiving a *Miranda* warning, as long as the waiver is knowingly, voluntarily, and intelligently given. *Miranda*, 384 U.S. at 444.  Two inquiries are relevant in determining whether a waiver was knowing, voluntary, and intelligent: (1) "the relinquishment of the right must have been … the product of a free and deliberate choice rather than intimidation, coercion, or deception,"; and (2) the individual must have understood the rights he was relinquishing. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Notably, however, a waiver need not be formal or express, but may be implied. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("[W]aiver can be clearly inferred from the actions and words of the person interrogated.").  "[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Thompkins*, 560 U.S. at 388-89.

17

### *1. Defendant's Pre-Miranda Statement*

Defendant argues that his statement denying the existence of contraband in his vehicle should be suppressed, because he had not yet been given a *Miranda* warning when the statement was elicited.  (Doc. 15 at 5).  However, there is a recognized "public safety" exception to the *Miranda* requirements, which provides that "when officers ask 'questions necessary to secure their own safety or the safety of the public' as opposed to 'questions designed solely to elicit testimonial evidence from a suspect,' they do not need to provide the warnings required by *Miranda*."  *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007) (quoting *New York v. Quarles*, 467 U.S. 649, 659 (1984)).[10]

"The public safety exception applies 'when officers have a reasonable belief based on articulable facts that they are in danger.'"  *Williams*, 483 F.3d at 428.  The subjective intent of the officers is not relevant.  *Quarles*, 467 U.S. at 656.  Instead, the Court looks to "objective facts … [and] takes into consideration a number of factors, which may include the known history and characteristics of the suspect, the known facts and

---

[10] The Court recognizes that the Sixth Circuit has previously limited the application of the public safety exception to circumstances where officers believe:  "(1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it."  *Williams*, 483 F.3d at 428.  However, this Court believes that the circumstances at issue in this case are more analogous to the Sixth Circuit's decision in *United States v. Mohammed*, where the court held that the public safety exception relieves the *Miranda* warning requirement when an officer asks whether a suspected drug trafficker has any drugs, weapons, or paraphernalia on his person prior to a patdown search.  501 F. App'x 431, 443-44 (6th Cir. 2012).  This Court also finds the Seventh Circuit's analysis of this issue in *United States v. Hernandez*, particularly instructive.  751 F.3d 538 (7th Cir. 2012) (holding that the public safety exception applied when officers asked a suspected heroin dealer, "[W]hat [is] in the red bag?" prior to searching it due to the danger of being impaled by a stray syringe or accidentally discharging a loaded gun).

circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest." *Williams*, 483 F.3d at 428.

Here, during a traffic stop where the driver was observed apparently leaning back then reaching for the front of his waistband before immediately reaching toward the glove box, and after observing in plain view sandwich bags and a digital scale in the backseat Defendant's vehicle, and knowing that Defendant has a criminal history involving drug use (*e.g.*, prescription pills, as well as heroin) and possession of a firearm, Officer MacMurdo, based on his extensive experience, chose to ask Defendant whether there were any other unlawful items in the vehicle before he conducted a search. (Tr. 10:1-11:10, 32:1-33:1). During the suppression hearing, when asked by defense counsel why he had inquired as to the contents of the vehicle prior to the search, Officer MacMurdo stated, "I didn't want to get poked with any needles. I wanted to find out if there was anything in the vehicle that was going to be a hazard or—or cause any safety concerns for myself or anybody in the general area." (*Id.* at 32:6-9).

This Court finds that the circumstances here present an issue of public safety to which the public safety exception applies. *See Quarles*, 467 U.S. at 656. It does not contravene the purposes of *Miranda* to allow police officers to minimize significant danger to themselves and the public by "ask[ing] questions reasonably prompted by a concern for the public safety," prior to conducting a lawful search. *Id.*[11] Moreover, because, here, just as in *Mohammed*, Defendant actually <u>denied</u> possessing any weapons

---

[11] "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but <u>only</u> in those types of situations in which the concerns that powered the decision are implicated." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984) (emphasis added).

or contraband, his statement was harmless.  *See Mohammed*, 501 F. App'x at 444.

("Surely, the admission of a statement that [Defendant] did not possess drugs or drug

paraphernalia on his person does not prejudice his defense.").

The Court declines to suppress Defendant's pre-*Miranda* statement.

### 2. Defendant's Post-Miranda Statements

Defendant also moves to suppress two post-*Miranda* statements:  (1) the statement

"Just take me to jail," in response to Officer Rhoads advising Defendant of his *Miranda*

rights; and (2) his statement that he 'found the gun' in response to Officer MacMurdo's

question regarding where Defendant had obtained the firearm.  Although Defendant

claims that these statements should be suppressed as having been "taken in contradiction

of *Miranda*," he does not specify the precise nature of the alleged violation.[12]

The Court, having reviewed the propriety of the manner in which the statements

were elicited, finds no *Miranda* violation.  To reiterate, "a suspect who has received and

understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the

right to remain silent by making an uncoerced statement to the police."  *Thompkins*, 560

U.S. at 388-89.  Here, it is undisputed that Defendant received a *Miranda* warning.  (Tr.

43:2-3).  Moreover, Defendant does not contend, and there is no evidence on which to

conclude, that Defendant did not understand the *Miranda* warning.  To the contrary,

---

[12] During the hearing, defense counsel did not make any further arguments to clarify the basis for suppression and in fact conceded that he "can't dispute that the evidence was that *Miranda* rights were read before the second and third statements." (Tr. 43:2-3).  Regardless, defense counsel stated that he sought suppression of the two post-*Miranda* statements, in addition to the one pre-*Miranda* statement.

Defendant's minimal and careful statements in response to the officers strongly indicate that he <u>did</u> understand the *Miranda* warning and tailored his responses accordingly.

The only issue that remains is whether Defendant invoked his *Miranda* rights and, if so, whether the invocation was honored. Defendant does not argue, and the record does not reflect, that Defendant ever attempted to invoke his right to counsel or to remain silent. Moreover, none of Defendant's statement can reasonably be construed as <u>unambiguous</u> and <u>unequivocal</u> invocations.

As Defendant did not invoke and, in fact, implicitly waived his *Miranda* rights, suppression of his post-*Miranda* statements is not warranted.

## IV. CONCLUSION

Based upon the foregoing, Defendant's motion to suppress (Doc. 15) is **DENIED.**

**IT IS SO ORDERED.**

Date: 6/2/2016                                             *s/ Timothy S. Black*
                                                          Timothy S. Black
                                                          United States District Judge